RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0123p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JEFFREY QUEEN,

       *Plaintiff-Appellee*,

  *v.*

CITY OF BOWLING GREEN, KENTUCKY; DUSTIN
ROCKROHR,

       *Defendants-Appellants*.

⎫
⎪
⎪
⎪
⎬ No. 18-5840
⎪
⎪
⎪
⎭

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:16-cv-00131—Joseph H. McKinley, Jr., District Judge.

Argued: March 21, 2019

Decided and Filed: April 22, 2020

Before: BOGGS, GIBBONS, and BUSH, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Jason Bell, BELL, HESS & VANZANT, PLC, Elizabethtown, Kentucky, for
Appellants. Michele Henry, CRAIG HENRY, PLC, Louisville, Kentucky, for Appellee.
**ON BRIEF:** Jason Bell, BELL, HESS & VANZANT, PLC, Elizabethtown, Kentucky, H.
Eugene Harmon, CITY OF BOWLING GREEN, Bowling Green, Kentucky, for Appellants.
Michele Henry, CRAIG HENRY, PLC, Louisville, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

JOHN K. BUSH, Circuit Judge. Jeffrey Queen sued his former employer, the City of
Bowling Green ("the City"), and a former supervisor, Dustin Rockrohr, asserting violations of

the Kentucky Civil Rights Act ("KCRA") and the Family and Medical Leave Act ("FMLA"). This appeal concerns whether the district court correctly denied summary judgment to the City and Rockrohr on certain KCRA claims, holding that they were not entitled to qualified immunity. For the reasons that follow, we **AFFIRM** the district court's denial of qualified immunity to the City as to the claims for hostile work environment based on religion and for retaliation and **AFFIRM** the district court's denial of qualified immunity to Rockrohr for the retaliation claim.

## I. BACKGROUND

Queen worked as a firefighter for the City from September 2011 to February 2016.[1] From the start, he was subject to harassment by his co-workers and supervisors because he is an atheist. His co-workers referred to him and other persons who did not espouse Christian beliefs as "pagans," a supervisor once stated that atheists "deserve[d] to burn," a second supervisor stated that he'd "be damned if I work with [atheists]," and that same individual also stated that he was "sure as hell glad none of those f[***]ers work here." Queen's co-workers and supervisors also asked Queen what church he attended, and told him to join a church and get "saved." Furthermore, according to Queen, he was forced to participate in Bible studies with his co-workers, during which he was instructed to read specific Bible verses. Also, according to Queen, his co-workers and supervisors badgered him regarding his sexuality and regularly disparaged members of minority communities.

The complained-of conduct continued throughout the five years that Queen worked at the fire department, notwithstanding that he first brought it to the attention of a supervisor, Rockrohr, in 2012, approximately one year into the job. According to Queen, he "complained to [Rockrohr] about some of those remarks that had been said." R. 41-1, PageID 295. Rockrohr "responded in hostility and didn't take it well and kind of shut the conversation down and told [Queen] that [he] needed to remember [his] place." *Id.*

---

[1]For purposes of this appeal, we consider the evidence in the light most favorable to Queen, who opposed the motion for summary judgment. *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019).

About a day or two later, Rockrohr told Queen that he had discussed the matter with the fire chief and they both believed that Queen "needed to get employment somewhere else." *Id.* at 295–96. When Queen asked why, Rockrohr answered that it was because Queen's "EMT had expired." *Id.* at 296.**[2]** Rockrohr also advised Queen that "things aren't working out for you, you need to look—be looking for something else," and that they should both have a meeting with the fire chief. *Id.* Just before that planned meeting, however, Queen told Rockrohr that he "was sorry" and "would try to do better, try to fit in better." *Id.* Rockrohr accepted Queen's apology and stated, "if you can promise not to make any more problems . . . I'll forego the meeting with the chief . . . but you need to watch yourself, you're going to be on the radar for a while." *Id.*

Queen's employment conditions did not improve after that conversation. In fact, shortly after he complained to Rockrohr, Queen was physically assaulted while retrieving his gear from his fire-station locker. According to Queen, someone "stuck their foot out and tripped [him]" and his co-workers "all laughed afterwards and called [him] a f[****]t and a p[***]y." R. 41-1, PageID 287. Queen was not sure who actually tripped him, but he knew that it was one of three people—Rockrohr, Caleb Hulsey, or Billy Daniels—because, according to Queen, "they were the only three close enough to have done it." *Id.* Also, Queen was regularly subject to the same kinds of disparaging remarks described above throughout the rest of his time at the fire department.

In February 2016, stress and anxiety from his colleagues' remarks caused Queen to take a leave of absence. While on leave, Queen received many phone calls from his supervisors asking why he was absent from work. Queen resigned in May 2016, and this lawsuit soon followed.

Specifically, in August 2016, Queen filed his complaint in Kentucky state court, asserting claims under the Kentucky Civil Rights Act ("KCRA") of hostile work environment based on religion and gender, and of constructive discharge and retaliation, as well as violations of the FMLA.**[3]** Appellants removed the lawsuit to federal court, invoking both federal question and diversity jurisdiction. After discovery concluded two years later, the City and Rockrohr

---

**[2]**EMT certification is not a requirement for Queen's position, but it is necessary to be eligible for increased pay.

**[3]**Queen did not file any claims for relief under Title VII.

(collectively, "Appellants") moved for summary judgment on all of Queen's claims, asserting qualified immunity under Kentucky law.  Appellants also contended that they were entitled to an *Ellerth*/*Faragher* defense under the KCRA as a matter of law and as a result, the City could not be vicariously liable for its employees' actions.[4]

The district court granted summary judgment to Appellants on the claims for hostile work environment based on gender under the KCRA and the FMLA claims, and to Rockrohr on the claim for hostile work environment based on religion under the KCRA.  The district court denied summary judgment to Appellants on Queen's claim that he was constructively discharged and his retaliation claims, and also denied summary judgment to the City on Queen's claim for hostile work environment based on religion under the KCRA, and on the City's entitlement to an *Ellerth*/*Faragher* defense.  Lastly, the district court also held that Appellants were not entitled to qualified immunity for any of Queen's claims that were not otherwise dismissed at summary judgment.

This timely interlocutory appeal followed.

## II.  DISCUSSION

We review the district court's summary judgment decision de novo.  *Simpson v. Ernst & Young*, 100 F.3d 436, 440 (6th Cir. 1996).  A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact."  *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a

---

[4]The *Ellerth*/*Faragher* doctrine provides the employer with an affirmative defense to vicarious liability and damages under Title VII if the employer can prove two elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 806–07 (1998).

triable issue of material fact." *Id.* at 448–49 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1985); Fed. R. Civ. P. 56(e)).

**A.      Interlocutory-Appeal Jurisdiction**

This is an interlocutory appeal from the denial of a motion for summary judgment based on a claim of qualified official immunity available to public officials or employees under Kentucky law. "As the denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, it is generally not immediately appealable. But the 'denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.'" *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985)). This includes appeals from the denial of qualified immunity under state law. *T.S. v. Doe*, 742 F.3d 632, 641 (6th Cir. 2014); *accord Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407–08 (6th Cir. 2007).

Therefore, we may decide an appeal "challenging the district court's *legal* determination" that the defendant is not entitled to qualified immunity. *DiLuzio*, 796 F.3d at 609. Further, this court may "decide an appeal challenging a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence." *Id.* (citations omitted). We also "may decide, as a *legal* question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

To the extent that an appeal from the denial of qualified immunity turns on a factual issue, there are "two narrow exceptions to the rule prohibiting fact-based interlocutory appeals." *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018). The first is that "[i]n exceptional circumstances, an appellate court may overrule a district court's determination that a factual dispute exists where evidence in the record establishes that the determination is 'blatantly and demonstrably false.'" *Id.* (quoting *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)). The second exception, relevant here, is that this court "may overlook a factual

disagreement if the defendant, despite disputing the plaintiff's version of the story, is 'willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Id.* (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)).

Queen asserts that we lack jurisdiction to decide this appeal because Appellants failed to concede the most favorable view of the facts to him and instead "rely exclusively on their version of the facts." Appellee Br. at 27. Queen is only partially correct. To be sure, Appellants have relied on their disputed version of the facts to support certain arguments that the district court erred in denying qualified immunity. For example, Appellants challenge the district court's conclusion that "Queen publicly acknowledged that he was an atheist," R. 50, PageID 1065, by asserting that "[i]t is undisputed," when it is in fact disputed, "that Queen never disclosed his atheism to anyone at the" fire station. Appellants Br. at 41. Similarly, with respect to Queen's retaliation claim, Appellants factually dispute whether Queen actually made a complaint about his work conditions that was sufficient to constitute a statutorily protected activity. *See* Appellants Br. at 51. We will not address Appellants' arguments for qualified immunity that are based on disputed facts.

However, Appellants present two purely legal questions that we may review. First, in response to Queen's claims of a hostile work environment based on his religion and employment retaliation, the City argues that it is entitled to immunity under Kentucky's Claims Against Local Governments Act ("CALGA"). Second, in response to Queen's retaliation claim, Rockrohr argues that under *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000), he is entitled to qualified immunity, as recognized by Kentucky common law.

Under our controlling precedent, these challenges present "neat abstract issues of law" that we have jurisdiction to review. *See Barry*, 895 F.3d at 445 (citation omitted). We therefore address the merits of these two challenges.

**B.     The City's Qualified-Immunity Defense**

We turn first to whether the City has qualified immunity under CALGA.**[5]**  The district court denied such immunity because "none of the alleged misdeeds in this case were in any way related to any judicial or legislative exercise of authority."  R. 50, PageID 1072.  We agree with the district court's ultimate conclusion but for a different reason: CALGA only covers actions in tort.

CALGA applies to "[e]very action in tort against any local government in this Commonwealth."  KRS § 65.2001 (emphasis added).  The statute defines "action in tort" as "any claim for money damages based upon negligence, medical malpractice, intentional tort, nuisance, products liability and strict liability, and also includes any wrongful death or survival-type action."  KRS § 65.200(a).**[6]**  The scope of immunity afforded to local governments under CALGA is set forth in KRS § 65.2003, which states in relevant part:

> Notwithstanding KRS 65.2001, a local government shall not be liable for injuries or losses resulting from:
>
> . . . .
>
> (3) Any claim arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government, which shall include by example, but not be limited to:
>
> > (a) The adoption or failure to adopt any ordinance, resolution, order, regulation, or rule;
> >
> > . . . .
> >
> > (d) The exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources[.]

KRS § 65.2003.

---

**[5]**Appellants expressly abandoned their argument that the City is entitled to qualified immunity under the common law of Kentucky by stating in their reply brief that "Appellants are not arguing that the City of Bowling Green is entitled to garden variety qualified immunity that is only available to individuals.  Rather, the immunity protections available to the City are specifically provided for by Kentucky statute."  Reply Br. at 20; *see Cosmichrome, Inc. v. Spectra Chrome, LLC*, 504 F. App'x 468, 471 (6th Cir. 2012).

**[6]**The statute states that this definition applies to KRS §§ 65.2001 and 65.2003.  *See* KRS § 65.200.

The Kentucky Supreme Court has explained that CALGA provides immunity to municipalities only for torts and not other forms of legal liability. *See Schwindel v. Meade County*, 113 S.W.3d 159, 163–66 (Ky. 2003) (explaining that KRS § 65.2001 "simply provides that all subsequent sections of [CALGA] apply . . . to 'actions in tort'"). Indeed, the Kentucky Supreme Court observed that under the statute, "a municipality [i.e., local government] is immune only for *torts* committed in the performance of legislative or judicial or quasi-legislative or quasi-judicial functions, and can be held vicariously liable for the *torts* of its employees." *Id.* at 164 (emphasis added) (citations omitted).

Following Kentucky Supreme Court precedent, the Kentucky Court of Appeals reversed a trial court's conclusion that a city was entitled to immunity under CALGA for a breach-of-contract claim. *Madden v. City of Louisville*, No. 2003-CA-001162-MR, 2004 WL 1588279, at *5 (Ky. Ct. App. July 16, 2004). The *Madden* court reasoned that "the breach of contract claim is not a tort. As such, it is not within the scope of CALGA, and the local governmental immunity provisions under the act are inapplicable." *Id.*[7]

*Madden* and *Schwindel* convince us that Kentucky courts would not apply CALGA to a KCRA claim because such a claim does not amount to an action in tort.

We also find persuasive the reasoning of *Ackermann Enterprises, Inc. v. City of Bellevue*, No. 14-207-ART, 2016 WL 5171864, at *5 (E.D. Ky. Sept. 19, 2016), in which Judge Thapar (as District Judge) addressed an argument similar to that asserted by Appellants here based on the "notwithstanding" language in KRS § 65.2003. According to Appellants, the immunity provisions of CALGA are limited to actions in tort for purposes of § 65.2001, but for purposes of § 65.2003, CALGA applies to *all* claims because of the phrase "[n]otwithstanding § 65.2001, a local government shall not be liable for injuries or losses resulting from . . . [a]ny claim arising from the exercise of . . . discretion vested in the local government" that appears in § 65.2003. *Ackerman Enterprises* rejected a similar argument:

---

[7]The *Madden* court also held that it was proper to conclude that the plaintiff's negligent-trespass actions were within the scope of CALGA because "negligent trespass is an action in tort." 2004 WL 1588279, at *5.

> [T]he "notwithstanding" language does not unmoor Section 65.2003 from the rest of the statute. Other sections of the statute expressly cabin Section 65.2003's application and construction. For example, Section 65.200 defines terms for the entire statute—which, of course, includes Section 65.2003. And Section 65.2001 provides that the sections that follow it . . . both apply to actions in tort and displace the common law of municipal tort liability only to the extent "specifically provided." *See also* KRS § 65.2006. Given that Section 65.2003's sister provisions each discuss "actions in tort," it would be odd to say that this one section—though governed by the same restrictions and placed smack-dab in the middle of the statute—speaks of something else. A more plausible reading is that, when Section 65.2003 addresses "claims disallowed," it is referencing those "claim[s] for money damages based upon negligence, medical malpractice, intentional tort, nuisance, products liability and strict liability" to which the statute expressly applies. KRS § 65.200(1).

2016 WL 5171864, at \*5. We adopt the reasoning of *Ackerman Enterprises*.

Consistent with this interpretation of CALGA, we hold that Queen's claims for hostile work environment based on religion and for retaliation are not within the scope of CALGA, as they do not meet the definition of "action in tort" set forth in § 65.200(1), given that they are statutory, not tort, claims. As such, the City is not entitled to immunity under CALGA on those claims. The judgment of the district court denying such immunity is therefore **AFFIRMED**. The claims against the City for hostile work environment based on religion[8] and for retaliation may therefore proceed on remand.

## C.     Rockrohr's Qualified-Immunity Defense

Rockrohr contends that the district court erred in denying him qualified immunity under Kentucky law with respect to Queen's retaliation claim. We disagree.

Under Kentucky common law, qualified immunity extends "to public officers and employees for acts performed in the exercise of their discretionary functions." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001); *accord Ritchie v. Turner*, 559 S.W.3d 822, 831 (Ky. 2018). Our court has previously held that this immunity can apply to retaliation claims under KRS § 344.280. *See Morris*, 201 F.3d at 794. To establish that a public employee holds qualified immunity, the employee must demonstrate that "the [alleged retaliatory] act was performed

---

[8]One issue not properly before us on this appeal is whether atheism is a protected class under the KCRA.

within the scope of his/her discretionary authority." *Yanero*, 65 S.W.3d at 523. Once demonstrated, "the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith" (*i.e.*, in bad faith). *Id.* (citations omitted). To prove bad faith, the plaintiff must demonstrate "a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* (citation omitted); *see also Turner v. Nelson*, 342 S.W.3d 866, 874–78 (Ky. 2011).

Under the "objective unreasonableness" analysis, a plaintiff must demonstrate the violation of a right and that the right was clearly established. *Rowan County v. Sloas*, 201 S.W.3d 469, 481–82 (Ky. 2006). "Clearly established" means that the "factual context of the occurrence must not exemplify a 'legally uncertain environment' in which qualified official immunity is appropriate." *Id.* (internal quotation marks omitted) (quoting *Jefferson Cty. Fiscal Court v. Peerce*, 132 S.W.3d 824, 834 (Ky. 2004)). Kentucky's "clearly established" requirement tracks the same standards used to determine if a statutory or constitutional right is "clearly established" for purposes of determining whether an officer has *federal* qualified immunity. *See id.* at 482 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) to explain that "[i]f the law at the time did not clearly establish that the officer's [or employee's] conduct would violate the [law], the officer should not be subject to liability" (alterations in original)).

Queen's retaliation claim against Rockrohr centers upon Queen's 2012 complaint to Rockrohr regarding the working conditions at the Bowling Green Fire Department and Rockrohr's response to that complaint. During the proceedings below, Queen "concede[d] that Rockrohr's response to his allegation of harassment was a discretionary act within the scope of [Rockrohr's] employment." R. 45, PageID 833. Thus, Queen bears the burden of proof to show that Rockrohr acted in "bad faith." *Yanero*, 65 S.W.3d at 523. On appeal, Queen does not argue that Rockrohr acted willfully or maliciously. Instead, Queen argues that the contours of the right to be free from retaliation were clearly established as of 2012 in light of the text of the KCRA and the employee-harassment-training acknowledgment forms that Rockrohr signed.

According to Queen, "Rockrohr knew or should have known of Queen's right to lodge a complaint of harassment with Rockrohr and be free from retaliation for having done so." Appellee Br. at 35.

Based on our court's decision in *Morris*, the district court was persuaded that Rockrohr was not entitled to qualified immunity because "[a] reasonable jury might find that [Rockrohr's] threats went far enough to violate Queen's clearly established right to complain[] about harassment." R. 50, PageID 1071. In reaching this decision, the district court noted that "unlike the supervisor in [*Morris*] who simply chose not to investigate the plaintiff's claims, here Rockrohr went a step further, telling Queen he should seek other employment because it 'wasn't working out' for him to continue at the Bowling Green Fire Department." *Id.* We agree with the district court that, based on *Morris* and subsequent decisions of this court interpreting KCRA, Rockrohr did not possess qualified immunity.

*Morris*, decided in 2000, stated that because "[t]he language of the KCRA generally tracks the language of Title VII[,]" the KCRA "should be interpreted consonant with federal interpretation." 201 F.3d at 793 (quoting *Meyers v. Chapman Printing Co.,* 840 S.W.2d 814, 821 (Ky.1992)). Our court has consistently followed this understanding, including in *Hamilton v. General Electric Co.*, 556 F.3d 428, 434 (6th Cir. 2009), where we evaluated an employer's alleged retaliatory act "using the same standard that we apply to federal Title VII claims," *id.* at 435.

Granted, there is one important difference between the KCRA and Title VII. Unlike retaliation claims brought under Title VII, the KCRA plainly "permits the imposition of liability on individuals." *Morris*, 201 F.3d at 794. Title VII, by contrast, only forbids retaliation by "an employer." *Id.* (quoting 42 U.S.C. § 2000e-3(a)). In light of the KCRA's broad definition of "person," *see* KRS § 344.010, we see no need to differentiate an individual state actor's liability from an employer's liability. The KCRA broadly prohibits "a person" or "two (2) or more persons" from retaliating against an individual who engaged in a protected activity under the statute. KRS § 344.280. Thus, we recognize that under KCRA, unlike under Title VII, liability can be imposed on both the employer and individuals who work for the employer, but otherwise

the standard for imposing liability is the same under the two statutes. *See Hamilton*, 556 F.3d at 434 (quoting *Morris*, 201 F.3d at 793 (quoting *Meyers,* 840 S.W.2d at 821)).

*Hamilton* was the last case interpreting KCRA that was decided by this court before Rockrohr's conduct at issue, which occurred in 2012. We have located no decisions of the Kentucky Supreme Court, or for that matter, reported decisions of any lower Kentucky state courts, addressing the KCRA post-*Hamilton* that contradict our interpretation of Kentucky law. Therefore, consistent with *Hamilton* and *Morris*, we evaluate Queen's KCRA retaliation claim by applying the Title VII standard.

Under *Burlington N. & Santa Fe Ry. Co. v. White*, a Title VII retaliation claim consists of a materiality requirement and an "objective standard." 548 U.S. 53, 68–69 (2006). To allege a retaliation claim, an employee must show that a "reasonable employee would have found the employer's challenged action materially adverse," *id*. at 68, or in other words, that the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations omitted); *see* Civil Rights Act of 1964, § 704(a), 42 U.S.C. § 2000e-3(a). The objective standard is phrased in

> general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

*Id*. (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82 (1998)).

The *Burlington* Court offered an illustrative, though not exhaustive, list of contextually-based adverse employment actions:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. *Cf., e.g*., *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (finding flex-time schedule critical to employee with disabled child). A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. *See* 2 EEOC 1998 Manual § 8, p. 8–14. Hence, a legal standard

that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." *Washington*, 420 F.3d at 661.

*Burlington*, 548 U.S. at 69.

We applied *Burlington* in *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006), to hold that, despite the employer's decision to reinstate the plaintiff after termination, a reinstatement with only seventy-percent back pay constituted a materially adverse action under Title VII. And, in *Michael v. Caterpillar Financial Services Corp.,* 496 F.3d 584 (6th Cir. 2007), we held that, although the plaintiff's brief placement on administrative leave and a mandatory ninety-day "performance plan" for job improvement were not sufficient to qualify for an anti-discrimination claim, they did "appear to meet [the] relatively low bar" announced in *Burlington* for an adverse employment action to support a retaliation claim. *Id*. at 596.

Given this "relatively low bar" for showing a materially adverse retaliatory employment action, we agree with the district court that Queen provided sufficient evidence to deny Rockrohr summary judgment on his qualified immunity defense. A reasonable jury could conclude that Rockrohr's subsequent conduct after receiving Queen's complaint about the harassment he faced at the Bowling Green Fire Department (which conduct included Rockrohr's suggestion that Queen "should get employment elsewhere" because "things [were] not working out") went far enough to amount to a materially adverse action. Indeed, Rockrohr's specific admonition made *directly* to Queen that he "should get employment elsewhere" could be interpreted by reasonable jurors to convey the message that Queen was no longer welcome at the Fire Department, thus amounting to a constructive termination of Queen's employment.

Queen's evidence provides more basis to find materially adverse employment action than in cases finding no such action where there was "a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886 (6th Cir. 1996); *see, e.g., Jones v. Johanns,* 264 F. App'x. 463, 469 (6th Cir. 2007) (no materially adverse employment action based merely on three letters directed to a plaintiff that ordered him to refrain from discussing his work-related disciplinary charges with other employees); *Mitchell v. Vanderbilt Univ.,* 389 F.3d

177, 182–83 (6th Cir. 2004) (no adverse employment action from the reduction of lab space from 2000 square feet to 150 square feet).

In 2012, Rockrohr would have clearly been on notice, based on *Hamilton*, applying *Morris*, that his conduct towards Queen following Queen's complaint would amount to a "materially adverse employment action" under the KCRA, meaning it would have been legally impermissible to discipline an employee in this manner. For this reason, the district court did not err when it denied qualified immunity to Rockrohr for Queen's retaliation claim, and accordingly, the district court's denial of summary judgment to Rockrohr on this claim is **AFFIRMED**.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's denial of qualified immunity to the City as to the claims for hostile work environment based on religion and for retaliation and **AFFIRM** the district court's denial of qualified immunity to Rockrohr for the retaliation claim.